FILED
CLERK, U.S. DISTRICT COURT

Oct 7, 2016

CENTRAL DISTRICT OF CALIFORNIA
BY: PMC DEPUTY

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KRISTINA GALLEGOS, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　Plaintiffs,<br><br>vs.<br><br>EC USA HOLDINGS INC., a Massachusetts corporation; EC LOS ANGELES LANGUAGE CENTER INC. a California corporation, and DOES 1 through 25,<br><br>　　　　　　　　Defendants. | CASE NO. 2:16-cv-03511-SVW-SK<br><br>**ORDER GRANTING MOTION TO REMAND [13]** |

## I. INTRODUCTION

Plaintiff seeks to remand a wage and hour case to state court, arguing that the amount in controversy is less than the $5,000,000 required for a Class Action Fairness Act suit. Defendants argue that even if Plaintiff's calculations are broadly accepted, punitive damages still place more than $5,000,000 in controversy, giving this Court jurisdiction.

For the reasons stated below, this Court **GRANTS** Plaintiff's motion to remand.

## II. BACKGROUND

On April 13, 2016, Plaintiff Kristina Gallegos ("Plaintiff") filed this putative wage and hour class action suit against Defendants EC USA Holdings Inc., a Massachusetts corporation, and EC Los Angeles Language Center, Inc., a California corporation, in Los Angeles County Superior Court. ("Defendants"). Dkt. 1-1. Plaintiff seeks to bring the action on behalf of herself and "[a]ll non-exempt hourly teachers employed by Defendants in California within the four years prior to the initiation of this action until the date that the class is certified." *Id*. ¶ 9. In her complaint, Plaintiff advances eight claims under California law: (1) failure to pay wages earned; (2) inaccurate wage statements in violation of Cal. Lab. Code § 226(a); (3) failure to pay overtime in violation of Cal. Lab. Code § 510; (4) failure to provide meal and rest breaks in violation of Cal. Lab. Code §§ 226.7, 512(a); (5) failure to pay unpaid wages at time of discharge in violation of Cal. Lab. Code §§ 201, 202; (6) failure to reimburse necessary expenses in violation of Cal. Lab. Code § 2802; (7) violation of the California Unfair Competition Law, Cal. Bus. & and Prof. Code § 17200 *et seq*.; and (8) conversion. *Id*. ¶¶ 14–47.

Plaintiff alleges that she was employed by Defendants as a teacher at their Los Angeles address between April 2014 and December 2015. Dkt. 1-1 ¶ 1. She also alleges that she and other members of the class worked for Defendants as hourly employees, and that Defendants "adopted and maintained uniform policies, practices and procedures governing the[ir] working conditions . . . and payment of wages." *Id*. ¶ 13. She asserts that her "claims are typical of the claims of the rest of the Class." *Id.* ¶ 10(b).

Plaintiff alleges that Defendants (1) required teachers to "prepare extensively" and provide extra tutoring, without compensation, *id.* ¶ 16; (2) refused to pay for time traveling to off-site events, *id.*; (3) did not issue sufficiently comprehensive wage statements, *id.* ¶ 19; (4) required class members to work more than eight hours in a day and/or more than forty hours in a week, more than twelve hours in a day, and more than eight hours on the seventh day of the workweek, without overtime, *id.* ¶23; (5) did not provide statutorily-compliant meal and rest periods, *id.* ¶ 28; (6) did not pay departing teachers wages within the timeframe required by law,

*id.* ¶ 32; and (7) failed to reimburse for classroom supplies or work-related personal vehicle use, *id.* ¶ 36.

On May 20, 2016, Defendants filed notice to remove this action to federal court, asserting jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d)(2). Dkt. 1. On June 13, 2016, Plaintiff filed a motion to remand the case back to state court. Dkt. 13. On June 20, 2016, Defendants filed an opposition to Plaintiff's motion to remand. Dkt. 15. On June 27, 2016, Plaintiff filed a reply memorandum in further support of Plaintiff's motion to remand. Dkt. 17.

**III. EVIDENCE**

Plaintiff submits a declaration regarding her employment as a teacher for Defendants. *See* dkt. 13-2. In the declaration, she alleges that Defendants' school was open only weekdays, and that she never taught on weekends. *Id.* ¶ 3. She received explicit instructions not to record "all of the time" she spent preparing, tutoring and traveling, which "would have been overtime." *Id.* ¶¶ 4–5. She also worked one full Saturday during her twenty months of employment and recalls "one or two other such Saturday [training] meetings" for employees; teachers would not otherwise have worked "a full day on a Saturday." *Id.* at ¶¶ 7–8.

Defendants submit two declarations in support of their opposition. The first is from Ann Connors, EC USA Holding's North America Payroll and Benefits Manager ("the Connors Declaration"). *See* dkt. 15-2 ¶ 1. Connors states that she has personal knowledge of the operations and employment records of EC Learning Centers in California, and that she has access to the company databases where employee information is stored. *See id*. ¶¶ 1, 3. Using that information, Connors provides data including (1) the number of non-exempt hourly California teachers during the relevant class periods and (2) the number of weeks they collectively worked; (3) that teachers were paid on a bi-weekly basis (26 pay periods/year); (4) that they earned between $19.22 and 19.93 per hour for teaching, $13.00 per hour for administration, and $10.00 per hour for preparation; (5) that 219 teachers left employment from April 13, 2013-May 20, 2016; (6) that Gallegos averaged 39.7 hours of work per week during

3

her 90 weeks of employment; and (7) that there is no reason to believe Gallegos's working hours differ from those of others similarly situated. *See id.* ¶¶ 5–10, 14–16.

Defendants' second declaration is from Sara Goddard, North America Talent Manager at EC USA Holdings, Inc ("Goddard Declaration"). *See* dkt. 15-3 ¶ 1. Goddard attests to her personal knowledge of Defendants' human resources practices and states that she never knew of any instruction that teachers should *not* do administrative or preparatory work on weekends. *See id.* ¶ 3.

Replying to Defendants, Plaintiff submits a supplemental declaration. *See* dkt. 17-1. In it, she states that Defendants intended teachers' rest breaks to be taken during class breaks, but that "two or three times per week" student or preparatory demands precluded taking such breaks in full. *See id.* ¶¶ 4–5. She also notes that an unknown number of teachers—including Gallegos herself for several months—worked only part-time schedules. *See id.* ¶¶ 6–7. In Plaintiff's case, this entailed "work[ing] only two or three days a week and [teaching] one or two 90 minute classes each day," and "sometimes [she] was not at the school for five hours a day." *Id.* ¶ 6.

## IV. PRESENT MOTION

Plaintiff moves to remand to state court, alleging that removal was improper because the amount in controversy is below the $5,000,000 CAFA threshold. *See* dkt. 13-1 at 1.

Plaintiff alleges that Defendants required class members to work overtime hours without compensation. *See* dkt. 1-1 ¶¶ 23. California law provides for two rates of overtime pay: time-and-a-half and double-time. *See* Cal Lab. Code § 510(a). First, employees earn time-and-a-half pay when they work more than eight hours in a day, forty hours in a week, or "the first eight hours worked on the seventh day of work in any one workweek."[1] *Id.* Second, employees earn double-time pay when they work more than twelve hours in a day or more than eight hours on the seventh day of a workweek. *See id.* Double-time overtime is thus always earned subsequent to an intermediate period of time-and-a-half—hours eight through twelve of regular workday, or

---

[1] The workweek may begin on any calendar day, as determined by the employer. Once set, whenever the employee works all seven days of the workweek, time-and-a-half is owed for "the first eight hours worked" on that seventh day. Cal. Lab. Code § 510(a).

4

1  hours one through eight of a seventh workday—and so the cost of a double-time violation
2  includes the cost of underlying time-and-a-half. *See* dkt. 13-1 at 5–6.

3        Plaintiff's complaint implicates both overtime rates, alleging that Defendants failed to
4  compensate employees for working (1) more than eight hours in a day or forty in a week, at
5  time-and-a-half; (2) more than twelve hours in a day, at double-time; and (3) more than eight
6  hours on the seventh day of a workweek, at double-time. *See* dkt. 1-1 ¶ 23. (Gallegos does *not*
7  claim that any seventh days were ever worked for *fewer* than eight hours.) She argues that
8  Defendants' calculations as to the frequency of such violations—based upon their estimate that
9  "each Class Member worked one of each type of overtime hour in each pay period"—are faulty.
10 She does not contest their assertion that once per pay period is a reasonable estimate of the
11 frequency with which employees worked more than twelve hours. *See* dkt. 13-1 at 8. However,
12 in light of her declaration that seventh-day training sessions occurred only once or twice per
13 year, she argues that seventh-day overtime violations should be calculated on a biannual basis.
14 *See id.* at 8–9. Additionally, she argues that Defendants overcount the frequency of time-and-a-
15 half violations, because the cost of the uncontested biweekly violation for working more than
16 twelve hours includes the cost of four underlying hours of time-and-a-half. *See id.* at 9–10. Given
17 Defendant's assertion that only *one* hour of each type went unpaid in each pay period, it would
18 be unreasonable to count a separate, additional hour of time-and-a-half overtime.

19       Defendants object to Gallegos's claim that seventh-day overtime violations occurred only
20 twice per year per employee. *See* dkt. 15 at 3. As the Goddard Declaration states that teachers
21 were not prohibited from working on weekends, *see* dkt. 15-3 ¶ 3, Defendants contend that
22 teachers may well have done so, creating additional seventh-day overtime violations beyond
23 those caused by training sessions, *see* dkt. 15 at 6–7. They also argue that there is no precedent
24 for excluding standalone time-and-a-half hours from the amount in controversy simply because
25 such hours are included in the cost of other violations. *See id.* at 8. While they nevertheless then
26 accept Gallegos's violation rates for the sake of argument, *see id.* at 8–9, their *maximum* claims
27 for each violation are listed below.

28

However, the Court notes that Defendants' Opposition contains a substantial number of mathematical errors. These make it difficult to determine the precise amount they seek to place in controversy. The errors and their corrections are identified in footnotes below, but in short, the Court has recalculated Defendants' contentions using their underlying evidence and their theories of the case, as follows:

**Defendant's Calculation of Amount in Controversy**

| Alleged Violation | Description | Amount in Controversy |
|---|---|---|
| Unpaid Wages (Dkt. 15 at 9–10) | One unpaid hour per period: $14 x 9,577[2] pay periods = $134,078 | $134,078[3] |
| Wage Statements (Dkt. 15 at 10) | 100% violation rate and 2,306 wage statements in total, resulting in (131 x $50 first statement penalty = $6,550) + ((2,306-131)=2,175 x $100 subsequent statement penalty = $217,500) = $224,050 | $224,050[4] |
| Unpaid Time-and-a-Half (Dkt. 15 at 10) | Hours in excess of eight per day earn time-and-a-half. Estimated at one such hour per person per pay period: $14 x 1.5 x 9,577[5] = $201,117 | $201,117 |
| Unpaid Double-Time (Twelve Hours +) (Dkt. 15 at 10–11) | Hours in excess of twelve per day earn double pay. Each such hour includes four hours of time-and-a-half (hours eight through twelve). Estimated at one such hour per person per pay period: ($14 x 2) + ($14 x 1.5 x 4) x 9,577[6] = $1,072,624 | $1,072,624 |
| Unpaid Double-Time (Seventh Day) (Dkt. 15 at 11) | Hours in excess of eight on the seventh worked day of a workweek earn double pay. Each such hour includes eight hours of time-and-a-half, the basic rate for the first eight hours of seventh-day labor. Estimated at one such hour per person per pay period: ($14 x 2) + ($14 x 1.5 x | $1,877,092 |

---

[2] Defendants variously state the number of pay periods as 9,277 and 9,577. *See* dkt. 15 at 7, 8 & n.4, 10. Based upon the Connors Declaration, the Court believes 9,577 is the accurate number.

[3] Defendants' NOR initially had 18,555 workweeks; however, Defendants' Opposition now states 19,154 workweeks pursuant to the Connors Declaration. Thus, by dividing 19,154 by 2, 9,577 pay periods is rendered. Defendants' formula is to then multiply the pay periods by the hourly rate of $14. Defendants initially multiplied the pay periods by $10, which explains the difference between the unpaid wages amount from the NOR and the Opposition. Dkt. 1 at 6-7; dkt 15 at 9-10.

[4] Defendants initially rounded this down to $224,000 in the Opposition but then double-counted the first-statement penalty amount, reaching an incorrect total of $230,550 in the table at the end of the Opposition. Dkt. 15 at 10, 15. A corrected calculation of $224,050 will be used to state Defendants' position for wage statement violations.

[5] Defendants again incorrectly used 9,277 pay periods as opposed to 9,577 pay periods. Dkt. 15 at 10. The Court believes 9,577 is the accurate number and makes the calculations as such.

[6] Defendant uses 9,277 again, and this Court uses 9,577.

6

| | | | |
|---|---|---|---|
| | | 8) x 9,577= $1,877,092 (or, in the alternative, 737 violations if Plaintiff's frequency rate is accepted[7], totaling $144,452) | |
| Meal Breaks (Dkt. 15 at 11) | 50% violation rate: $14 x 2.5 meals per week x 15,507 workweeks = $542,745 | | $542,745 |
| Rest Breaks (Dkt. 15 at 12–13) | 100% violation rate: $14 x 1 break per day x 15,507 workweeks x 5 days per workweek = $1,085,490 | | $1,085,490[8] |
| Waiting Time Penalties (Dkt. 15 at 13) | $14 x 7 hour workday x 30 day penalty x 217 severed employees = $637,980 | | $637,980 |
| **Subtotal** | | | **$5,775,176** |
| Punitive Damages (Dkt. 15 at 13–14) | 25% of above recovery | | $1,443,794 |
| **Subtotal** | | | **$7,218,970** |
| Attorney's Fees (Dkt. 15 at 14–15) | 25% of above recovery | | $1,804,743[9] |
| **Total** | | | **$9,023,713** |

Plaintiff contests the Defendants' calculations.[10] *See* dkt. 17 at 1–2. First, she argues that no punitive damages should be considered because the verdicts cited by Defendants to establish such damages are insufficiently analogous to the present case. *See id.* at 5. Second, she reasserts the position that time-and-a-half violations are included within the cost of double-time violations, and that seventh-day violations occurred only semi-annually. *See id.* at 6–7. Third, Gallegos objects strongly to Defendant's meal and rest period violation rates. Defendants assume a 50% meal break violation and a 100% rest break violation. *See* dkt. 15 at 11–13. Absent clear

---

[7] Defendants again miscalculated this as 714, based upon their incorrect use of 9,277, not 9,577, as the total number of pay periods.

[8] Defendants transposed the declared number of workweeks to read 15,705, and from this erroneous figure miscalculated a figure of $1,099,350. The Court corrects the error and uses 15,507 workweeks, as stated in the Connors Declaration. *Compare* dkt. 15 at 13 n.13, *with* dkt. 15-2 ¶ 8.

[9] Defendants variously state this as two different amounts in their reply, using $1,193,585 in its calculation table and header but $1,225,983.75 in text. *See* dkt. 15 at 15. The Court uses its own calculations based upon 25% of the underlying figures.

[10] Plaintiff argues that Defendants' estimates should be limited to the amounts alleged in their Notice of Removal, but the Court finds this argument without merit. Plaintiff cites no authority that the amount in controversy must be limited to Defendants' notice of removal. Dkt. 17. To the contrary, courts have held that when the Plaintiff challenges Defendant's amount in controversy, "both sides submit proof and the

language in the complaint about consistent violations, she argues, the 100% rest break violation assumption is unsustainable. *See* dkt. 17 at 13. Gallegos leans on her supplemental declaration to argue that the proper rest break violation rate is 50%, or two-and-a-half times per week. *See id.* Plaintiff also argues that the 50% meal break violation assumption is inappropriate because not all teachers taught shifts long enough to entitle them to meal breaks. *See id.* at 14–15.

In sum, Plaintiff's *minimum* amount in controversy is:

**Plaintiff's Calculation of Amount in Controversy**

| Alleged Violation | Description | Amount in Controversy |
|---|---|---|
| Unpaid Wages (Dkt. 17 at 15) | As alleged in Defendants' Notice of Removal | $92,770 |
| Wage Statements (Dkt. 17 at 15) | As alleged in Defendants' Notice of Removal | $215,300 |
| Unpaid Time-and-a-Half (Dkt. 17 at 7) | Subsumed within double-time violations | $0 |
| Unpaid Double-Time (Twelfth Hour) (*see* dkt. 17 at 7–8) | As described by Defendants[11] | $1,072,624 |
| Unpaid Double-Time (Seventh Day) (Dkt. 17 at 6) | As alleged in Defendants' Opposition. | $144,452[12] |
| Meal Breaks (Dkt. 17 at 14–15) | As alleged in Defendants' Notice of Removal | $215,530 |
| Rest Breaks (Dkt. 17 at 11–14) | 50% violation rate (2.5 x $14 x 15,507) = $542,745 | $542,745[13] |
| Waiting Time | As alleged in Defendants' Notice of Removal | $504,000 |

---

court decides where the preponderance lies." *Ibarra v. Mannheim Investments, Inc.*, 775 F.3d 1193, 1198 (9th Cir. 2015).

[11] Plaintiff asks to enter $1,033,424 in controversy, but as she accepts Defendant's underlying figures and methodology, the Court will use the correctly multiplied result.

[12] Plaintiff asks to enter $139,247 in controversy, but as she accepts Defendants' underlying figures, the Court will use the correctly multiplied result.

[13] Plaintiff had here relied upon Defendants' incorrect figure of $549,675 for its own calculation, but in doing so perpetuated the error brought about by Defendant's transposition of digits. *See supra* n.9. This Court amends the number appropriately.

8

| | | |
|---|---|---|
| Penalties (Dkt. 17 at 16) | | |
| **Subtotal** | | **$2,787,421** |
| Punitive Damages (Dkt. 17 at 2–6) | $0 | $0 |
| Attorney's Fees (Dkt. 17 at 16) | 25% of the above | $696,855 |
| **Total** | | **$3,484,276** |

## V. LEGAL STANDARDS

*A. CAFA Jurisdiction*

CAFA gives federal district courts original jurisdiction over class actions which involve at least 100 class members, minimal diversity, and an amount in controversy exceeding $5,000,000. 28 U.S.C. § 1332(d). In giving notice of removal, a defendant is required only to offer a "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). A "defendant's amount-in-controversy allegations should be accepted when not contested by the plaintiff or questioned by the court." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014).

There is no antiremoval presumption in CAFA cases. *Id.* at 554. But when a plaintiff contests a defendant's amount-in-controversy calculation, the defendant still bears the burden of establishing that removal was proper by a preponderance of the evidence. *Id.* at 553–54; *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 977 (9th Cir. 2013).

The Ninth Circuit has defined the broad outlines of the process after a plaintiff contests removal jurisdiction under CAFA. "In determining the amount in controversy, courts first look to the complaint." *Ibarra v. Mannheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). Next, "[t]he parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Id.* (internal quotation marks omitted). This procedure prevents a defendant from establishing federal jurisdiction "by mere speculation and conjecture, with unreasonable assumptions," instead requiring the parties to rely on "real evidence and the reality of what is at

stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Id.* at 1197–98.

B. Assumptions When Language of Complaint is Unclear

There is limited appellate guidance on how district courts should interpret the evidence presented by the parties. *Duberry v. J. Crew Grp., Inc.*, No. CV 14-8810 SVW (MRW), 2015 WL 4575018, at *2 (C.D. Cal. July 28, 2015). When a party relies on a chain of reasoning that includes assumptions, those assumptions must be reasonable. *Ibarra*, F.3d at 1199 (assumptions "cannot be pulled from thin air but need some reasonable ground underlying them"). Therefore it would be unreasonable to assume a 100% violation rate based only on a plaintiff's allegation of a "pattern and practice" of labor violations. *Id.* at 1198–99 ("a 'pattern and practice' of doing something does not necessarily mean *always* doing something"). [emphasis in original].[14] But a defendant may establish the amount in controversy by presenting admissible statistical evidence taken from a representative sample and extrapolated to calculate the potential liability for the full class. *See LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202–03 (9th Cir. 2015).

C. Punitive Damages

"Where both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining jurisdictional amount." *Bell v. Preferred Life Assur. Soc. of Montgomery, Ala.,* 320 U.S. 238, 240 (1943). When removing defendants seek to rely on punitive damages to establish the amount in controversy, however, they should introduce jury verdicts in comparable cases to demonstrate the reasonableness of their claim. *See Faulkner v. Astro-Med, Inc*., No. C 99-2562 SI, 1999 WL 820198, at *4 (N.D. Cal. Oct. 4, 1999) (finding that citation to an award of $400,000 to an employee with fifteen years' service did not raise a presumption that punitive damages would allow a plaintiff with a few months' service to meet the $75,000 jurisdictional threshold). "While settlements and jury verdicts in similar cases can

---

[14] Even after *Ibarra*, a defendant may assume a 100% violation rate when a complaint alleges a practice that is universally followed. *See* 775 F.3d at 1199. Thus, it is not unreasonable to assume a 100% violation rate when the allegations support the inference that a defendant "may potentially violate the law in each and every situation where those policies are applied." *Mejia v. DHL Express (USA), Inc.*, No. CV 15-890-GHK JCX, 2015 WL 2452755, at *4 (C.D. Cal. May 21, 2015).

provide evidence of the amount in controversy, the cases must be factually identical or, at a minimum, analogous to the case at issue." *Mireles v. Wells Fargo Bank, N.A.*, 845 F. Supp. 2d 1034, 1055 (C.D. Cal. 2012) (finding that the cost of settlement of dissimilar class actions could not be used to establish the CAFA jurisdictional threshold of $5,000,000). The court in *Killion v. Autozone Stores Inc.* 2011 WL 590292 at *2 (C.D. Cal. 2011) found that although Defendants cited cases where punitive damages were awarded, Defendants did not analogize the cases to its own case and so even though punitive damages were possible, there was no evidence that it was probable. "Therefore, Defendants' inclusion of punitive damages in the calculation of the jurisdictional amount is speculative and unsupported." *Id.*

If "[t]he court has not been presented with any *facts* that would support an award of punitive damages . . . Defendant's burden cannot be met simply by pointing out that the complaint seeks punitive damages and that any damages awarded under such a claim *could* total a large sum of money . . . ." *Conrad Assocs. v. Hartford Acc. & Indem. Co.,* 994 F. Supp. 1196, 1201 (N.D. Cal. 1998) (finding that citation to multimillion-dollar punitive damage awards in inapposite cases did not create an inference that the jurisdictional threshold was likely to be met). Courts will not speculate when the Defendant has not provided "a sound basis for th[e] Court to estimate a potential award of [punitive] damages." *MIC Philberts Investments v. Am. Cas. Co. of Reading, Pa.*, No. 1:12-CV-0131 AWI-BAM, 2012 WL 2118239, at *6 (E.D. Cal. June 11, 2012) (counting no punitive damages towards the jurisdictional threshold where Defendants supplied ill-matched precedents); *accord Scalzo v. Allied Prop. & Cas. Ins. Co.,* 2011 WL 2709001, at *3 (E.D. Cal. 2011) ("The cases cited by Defendant involve a different kind of insurance. . . . Defendant also has not provided a sound basis for this Court to estimate a potential award of said damages, and the Court will not speculate."); *Jordan v. Fed. Exp. Corp.*, No. CV 08-4729-GPS(PLAX), 2008 WL 4381645, at *2 (C.D. Cal. Aug. 25, 2008) (finding no punitive damages for subject matter jurisdiction purposes where "Defendant does not provide any factual data on [verdicts in comparative] cases nor does it explain how this instant action is similar to the listed causes of action.").

## VI. ANALYSIS

The parties do not dispute the first two requirements of 1332(d). Thus, the only threshold issue is whether the amount in controversy requirement has been satisfied. Dkt. 13 at 2.

### A. Unpaid Wages

Defendants estimate that each class member places one unpaid regular hour per pay period in controversy, *see* dkt. 1 ¶¶ 28–29, and based upon Gallegos's declaration that unpaid time included both preparation and tutoring hours (payable at $19.38), they use a "blended average rate of $14 per hour," *see* dkt. 15 at 9. Defendants note that as Gallegos did not assert an alternative rate of violation, the one hour per period estimate should hold. *Id.* n.6 (citing *Unutoa v. Interstate Hotels & Resorts, Inc.*, No. 2:14–cv–09809–SVW–PJW, 2015 WL 898512, at *3 (C.D. Cal. Mar. 3, 2015)) (determining that a violation rate may be assumed when it is uncontested by the opposing party and uncontradicted by evidence). Whether or not the language of the complaint supports an assumption of biweekly frequency, such an assumption is consistent with Gallegos's declaration. Further, Plaintiff simply states that the "new numbers should be thrown out" and cites *Ellis v. Pacific Bell Telephone Co.*, 2011 WL 499390 at *3 (C.D. Cal. 2011), where the court rejected the defendant's assumption of overtime hours for the putative class members because the "figure was not based on any evidence." Dkt. 17 at 11. However, this Court believes that there is evidence in this case pursuant to the Connors Declaration, which supports the new figure.[15] Therefore, since Plaintiff does not dispute the methodology used by Defendants in Defendants' NOR, the court finds Defendants' figure reasonable. *See* dkt. 17 at 11. Accordingly, this Court finds that Defendants' unpaid wage estimate is reasonable and places **$134,078** in controversy.

### B. Wage Statements

Defendants also argue that the wage statement penalty should be estimated at a 100% violation rate for the number of pay stubs stated within the Connors Declaration. *See* dkt. 15 at

---

[15] By using the correct 9,577 figure in Connor's Declaration and multiplying that by the blended rate of $14, the unpaid wages total is $134,078. Although Defendant used a rate of $10 in its NOR, this Court believes that Plaintiff's declaration supports the Defendant's blended rate figure. Dkt. 13 ¶ 5.

10; dkt. 15-2. Plaintiff submits the same argument for wage statements as she did for unpaid wages. However, this Court again finds that the Connors Declaration provides sufficient evidence for Defendants' new figure.[16] *See* dkt. 17 at 11; Dkt. 15-2. Thus, this Court finds that Defendants' wage statement estimates are reasonable and, after correcting Defendants' arithmetic, places **$224,050** in controversy.

C. Unpaid Overtime

Defendants estimate violations to have occurred once per pay period for each of the three types of overtime, but they argue that the amount in controversy would also be met using Gallegos's overtime frequency proposals. *See* dkt. 1 ¶¶ 41–43; Dkt. 15 at 10–11.

1. Type B Overtime

The Court turns first to the double-time violations for working more than twelve hours in a day, the cost of which includes the cost of four time-and-a-half hours for the time between the eighth hour and the twelfth, and one double-time hour after the twelfth hour. Defendants estimate that such violations occurred once per pay period per employee, for a total of $1,072,624. Gallegos does not contest this frequency rate, and this Court places **$1,072,624** in controversy.

2. Type A Overtime

Regarding additional standalone time-and-a-half hours, Defendants estimate that "Plaintiff and putative class members worked *one* hour of unpaid [time-and-a-half] Overtime per pay period." Dkt. 1 ¶ 42 (emphasis added). However, because the cost of the biweekly double-time violation includes *four* hours of unpaid time-and-a-half, time-and-a-half violations are already overincluded in the amount-in-controversy. *See* dkt. 17 at 7. Defendants are effectively asking to place in controversy *five* hours of time-and-a-half per pay period, though they do not themselves rely on this in their opposition. *See* dkt. 15 at 8, 15.The Court finds that a once-per-pay-period time-and-a-half hour violation is **already included** within the amount in controversy.

---

[16] The Connors Declaration states that "[f]rom April 13, 2015 to May 10, 2016, there were approximately 131 non-exempt, hourly teachers employed…" "…for approximately 4612 weeks." Since the NOR had different figures, this Court finds that the Connors Declaration provides sufficient evidence to support the new figure. Dkt. 15-2 ¶ 9-10.

However, even if it were added separately as an additional $201,117, it would not be dispositive upon this motion.

### 3. Type C Overtime

Finally, regarding seventh-day double-time violations, Plaintiff's declaration is clear as to the frequency of such events: twice yearly. *See* dkt. 13-2 ¶ 6. Defendants' only contrary evidence is the Goddard Declaration states that employees were never told not to work on weekends, from which they infer that employees might then have done so. However, Plaintiff's Reply Memorandum in Further Support of Plaintiff's Motion to Remand states that Plaintiff's declaration is regarding the seventh-day double-time violation "mean[ing] a full Saturday of work of *any type*." [emphasis added]. Dkt. 17 at 7. Defendants do not seem persuaded by their own argument, and note that "[t]he [new] amount in controversy was calculated by adopting *Plaintiff's proposed violation rate—one every 13 pay periods*." Dkt. 15 at 11. The Court agrees with this position and places **$144,452** in controversy.

### D. Meal Breaks

Based upon Gallegos's allegations that meal breaks were not always provided, *see* dkt. 1-1 at 10, Defendants allege that "a reasonable assumption is a 50% violation rate," dkt. 15 at 11. Gallegos argues that as her supplemental declaration states not all employees were full time and not all part-time shifts exceeded five hours, only a subset of employees were entitled to meal breaks, making Defendants' 50% rate inappropriate, and instead she asks the Court to use a 20% rate. *See* dkt. 17 at 15.

As for how many employees fell into the part-time category and were thus ineligible for meal breaks, Gallegos notes that "Defendants should have this information, but have chosen not to share it." *Id.* The Court need not resolve this question, as it is not dispositive upon this motion. Without deciding, the Court uses Defendants' 50% violation rate but correct Defendants' calculations, placing **$542,745** in controversy.

*E. Rest Breaks*

Defendants seek to apply a 100% violation rate to the allegation that rest breaks were unable to be taken "at times." Dkt 15 at 12. Gallegos's supplemental declaration, however, states that such violations occurred approximately half the time. *See* dkt. 17-1 ¶ 5. Defendants cite no controlling precedent to assume a 100% violation rate when the alleged violation occurred "at times." According to the Court's already cited legal standard in *Ibarra*, an alleged violation occurring *at times* does not account to a "'pattern and practice' [that] is universally followed every time the wage and hour violation could arise." 775 F.3d at 1199. Therefore, in light of Plaintiff's uncontradicted evidence pointing to a 50% rate, the Court finds Plaintiff's rate more reasonable and places the resulting amount, **$542,745**, in controversy.

*F. Waiting Time Penalties*

Defendants' estimation of waiting time penalties is based upon a 100% violation rate and the Connors Declaration's statement of Gallegos's actual pay rates and averaged worked hours, as well as the number of severed employees whose delayed final payments would incur such penalties. *See* dkt. 15 at 13. Given that this evidence is uncontradicted, the Court places **$637,980** into controversy.

*G. Punitive Damages*

Plaintiff's request for punitive damages stems from her allegation of conversion. Both parties rely on *Faulkner v. Astro-Med, Inc.* No. C 99-2562 SI, 1999 WL 820198, at *4 (N.D. Cal. Oct. 4, 1999) for the proposition that punitive damage estimates, when considered for amount-in-controversy purposes, must be supported by comparable jury verdicts. *See* dkt. 15 at 14; dkt. 17 at 2. Having identified the legal standard, though, Defendants fail to meet this requirement. The cases upon which Defendants rely bear no resemblance to the present facts. Instead, they include an individual plaintiff's claim of conversion, fraud, and battery in which the plaintiff lost his teeth, *Hong v. World Christian Theological Univ.*, No. BC390377, 2012 WL 7187391 (Cal. Super. Ct. May 4, 2012); a corporate plaintiff's claim of negligence, conversion, interference with a contract, and interference with economic relations, *Dell v. Bank of America, N.A. et al.*,

15

No. CIVRS804433, 2010 WL 3614954 (Cal. Super. Ct. Jun. 30, 2010); an individual plaintiff's claims of slander, breach of contract, and conversion of personal property, *Johnson v. Kirk et al.*, No. YC058303, 2010 WL 5383270 (Cal. Super. Ct. Dec. 1, 2010); and a corporate plaintiff's claims of fraud, negligent misrepresentation, breach of contract, and conversion against its own employee, *Russell Branton Inc. v. Gerald Castle*, No. VCVVS035845, 2006 WL 4247918 (Cal. Super. Ct. Oct. 26, 2006).

The only case provided by Defendants with *any* sort of resemblance to the case at hand is *Boren v. Glob. Med. Mobile Diagnostics, Inc*., Nos. BC356430, BC366992, 2008 WL 7702367 (Cal. Super. Ct. May 22, 2008). Though *Boren* is a wage and hour case, like this case, it appears that the jury awarded punitive damages in *Boren* for fraud, oppression, or malice, which are claims not alleged in this case. Punitive damages in this case are based on a claim for conversion.

None of these cases permit the Court to infer what punitive damages might result in a class action in which there was no battery, no slander, no breach of contract, no negligent misrepresentation, and no malice. Without presenting analogous cases and an explanation of how those cases relate to the present facts, Defendants do not carry their burden, and this Court need not speculate on their behalf. Punitive damages should not be included within the amount in controversy.

H. Attorneys' Fee

Consistent with other cases where attorneys' fees are provided for by statute, Defendants argue that the Court should include a 25-percent attorney's fee multiplier to the amount in controversy. Dkt. 15, 14–15. In previous rulings on the issue, this Court has agreed. *See Salcido v. Evolution Fresh, Inc.*, No. 2:14-cv-09223-SVW-PLA, 2016 WL 79381 at *8 (C.D. Cal. Jan 6, 2016); *Oda*, 2015 WL 93335, at *5. In addition, Plaintiff does not contest the 25-percent fee multiplier for attorney's fees. Thus, based on the **$3,298,674** placed in controversy by the claims above, this Court finds that Defendants' request for attorney's fees places an additional **$824,669** in controversy. Therefore, the total amount in controversy is **$4,123,343.**

1 **VII. CONCLUSION**

2  Defendants have not shown by a preponderance of the evidence that this Court has subject matter jurisdiction. The amount in controversy does not exceed $5,000,000, an outcome that would remain the same even if additional standalone time-and-a-half and related attorney's fees were counted in Defendants' favor. Accordingly, this Court lacks subject matter jurisdiction to hear this case, and Plaintiff's motion to remand to state court is **GRANTED**.

IT IS SO ORDERED

Date: October 7, 2016

_____
HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE